UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM. ACTION NO.  5:03-50033-05 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| ANTHONY GENTRY | MAG. JUDGE MARK L. HORNSBY |

MEMORANDUM ORDER

Pending before the Court is a motion styled, "Emergency Motion to Effect Early Release 18 Title U.S.C. §§ 3582(c)(1)(A)(i) and (c)(1)(B)" [Doc. No. 522] filed by Defendant Anthony Gentry ("Gentry").   The United States has filed a response.  [Doc. No. 527].

On March 27, 2003, a federal grand jury in Shreveport returned a four-count Indictment against Gentry and five accomplices for their participation in an armored-car heist, high-speed chase, and shootout which left a police officer wounded. [Doc. No. 61]. On July 16, 2003, Gentry pleaded guilty to Counts Two (aggravated bank robbery) and Three (use of a firearm during a crime of violence) of that Indictment. [Doc. Nos. 105–06].[1] On February 24, 2005, the Court

---

[1] Although Gentry acknowledges the "seriousness of the predicate conviction which gave cause for [his] entry into the Federal Bureau of Prisons," he understates the violent nature of his criminal conduct. [Doc. No. 522, at 3]. As part of his plea agreement, Gentry agreed that on the morning of March 13, 2003, he and his cohorts knowingly and intentionally robbed at gunpoint over $700,000 in cash from an armored car making deliveries to Shreveport-area banks. [Doc. No. 108]. The robbers wore ski masks to hide their identities and armed themselves with a high-powered assault rifle and semi-automatic handguns. *Id.*  After gathering the cash, the group tied up the bank employees and fled the scene to a secondary location where they switched vehicles and burned the original getaway car with gasoline to further avoid detection. *Id*. Nevertheless, local police  spotted the group as they were travelling along Interstate 220 toward Bossier City. *Id*. During the ensuing high-speed chase, one of the assailants knocked out the rear window of their van and used the assault rifle to fire indiscriminately on police, wounding an officer. *Id*. Police eventually tracked the group to a local residential neighborhood where they attempted to flee on foot into local homes but were apprehended. *Id.*

sentenced Gentry to consecutive terms of imprisonment of 240 months on Count Two and 120 months on Count Three. [Doc. Nos. 256–57].

Gentry moves the Court for early release or release to home confinement immediately because he has conditions that make him more vulnerable to the COVID-19 virus.  In support of his motion, Gentry points out that he has been diagnosed with chronic Hepatitis C virus, asthma, and spots on his lungs.

Given the issues raised and the known threat from the Covid-19 pandemic, the Court ordered the United States to file a response no later than May 4, 2020.  [Doc. No. 524].  The United States complied with that directive and filed its opposition [Doc. No. 527] on May 4, 2020.

The United States asserts that, based upon the body of Gentry's motion, it remains unclear whether he seeks compassionate release under 18 U.S.C. § 3582(c)(1)(a), or release to home confinement under the recently enacted Coronavirus Aid, Relief, and Economic Security (or "CARES") Act, Pub. L. 116-136. The United States further asserts that, as of May 4, 2020, Gentry has not sought relief through the Bureau of Prisons ("BOP") administrative channels as required for release under *either* avenue, and, therefore, the Court does not have jurisdiction to consider his motion.

*Compassionate release under 18 U.S.C. § 3582(c)(1)(a)*

A judgment, including a sentence of imprisonment, "may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010). Consistent with that principle of finality, 18 U.S.C. § 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," except in three circumstances: (1) upon a motion for reduction in sentence, under 18 U.S.C. § 3582(c)(1)(A), such as that presented by Gentry; (2) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal

Rules of Criminal Procedure," under 18 U.S.C. § 3582(c)(1)(B); and (3) where the defendant was sentenced based on a retroactively lowered sentencing range, under 18 U.S.C. § 3582(c)(2). At least in the context of relief under § 3582(c)(2), which allows a sentence reduction based upon a retroactive guideline amendment, the Fifth Circuit has recognized the prerequisites are jurisdictional. *See United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) ("The first question is whether the district court had jurisdiction to reduce [the defendant's] sentence at all.").

Relevant here, under § 3582(c)(1)(A), a court may reduce a term of imprisonment upon finding "extraordinary and compelling circumstances," consistent with guideline policy statements. Under the statute as amended by the First Step Act, the Court may act "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has *fully exhausted all administrative rights* to appeal a failure of BOP in bringing a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id*. (emphasis added).

The requirement that an inmate first exhaust his administrative remedies within the BOP is jurisdictional. *See Garcia*, 606 F.3d at 212 n.5; *see also United States v. Raia,* 954 F.3d 594 (3d Cir. 2020) (characterizing the defendant's failure to exhaust administrative remedies as "a glaring roadblock foreclosing compassionate release at this point"); *United States v. Johnson*, No. RDB-14-0441, 2020 WL 1663360, at *3–6 (D. Md. Apr. 3, 2020) (concluding in a lengthy discussion that § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional and not subject to any exceptions); *United States v. Eberhart*, No. 13-cr-00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) (holding, in a case involving a compassionate release motion based on COVID-19 concerns, "[b]ecause defendant has not satisfied the exhaustion requirement, the court lacks authority to grant relief under § 3582(c)(1)(A)(i)").

At the very least, the exhaustion requirement is a mandatory claims-processing rule that must be enforced where, as here, it is invoked by the United *States. See Eberhart v. United States,* 546 U.S. 12, 18-19 (2005) (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a non-jurisdictional but mandatory claim-processing rule that "assure[s] relief to a party properly raising [it]"); *United States v. Pesina-Rodriguez*, 825 F.3d 787, 788 (5th Cir. 2016) ("Although not jurisdictional, the time limits in Rule 4(b)(1)(A) [for filing a notice of direct appeal in a criminal case] are mandatory claims-processing rules.").

The Supreme Court has recently reaffirmed the principle that a district court may not ignore a statutory command such as that included in § 3582(c)(1)(A). In *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Court rejected a judicially created "special circumstances" exception to the exhaustion requirement stated in the Prison Litigation Reform Act of 1995 ("PLRA"). That Act mandates that an inmate must exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a). Rejecting the "freewheeling approach" adopted by some courts of appeals, under which some prisoners were permitted to pursue PLRA claims even when they had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances. *Id*. at 1856. The Court further noted that "judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions," a statutory exhaustion provision "stands on a different footing." *Id*. at 1857. That is because "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." *Id*.

But beyond being mandatory, Congress' requirement that inmates must initially resort to administrative remedies exists for good reason: BOP conducts an extensive assessment for such

requests, and it is in the best position to do so. *See* 28 C.F.R. § 571.62(a); BOP Program Statement

5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18

U.S.C. §§ 3582(c)(1)(A) and 4205(g).[2]  As those procedures reflect, the BOP completes a diligent

and thorough review, applying its considerable expertise concerning both the inmate and the

conditions of confinement.

Significantly, the BOP will now be guided in its review by an expanded consideration of

whether a defendant is suitable for transfer to home confinement as an alternative to compassionate

release. In a March 26, 2020 Memorandum issued by Attorney General William Barr, the BOP

was directed to prioritize the use of its various statutory authorities (such as 18 U.S.C. § 3624(c)(2)

and 34 U.S.C. § 60541(g)) to grant home confinement in appropriate circumstances.[3]  Long before

the COVID-19 pandemic, that authority included the ability to place an inmate in home

confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C.

§ 3624(c)(2), and to move to home confinement those elderly and terminally-ill inmates specified

under 34 U.S.C. § 60541(g).

More recently, an April 3, 2020 Memorandum from the Attorney General to the BOP,

pursuant to § 12003(b)(2) of the CARES Act, Pub. L. No. 116-136, "expand[s] the cohort of

inmates who can be considered for home release." Under that Memorandum, in order to maximize

transfer to home confinement "all appropriate inmates held at [Oakdale], FCI Danbury, FCI

Elkton, and similarly situated BOP facilities where COVID-19 is materially affecting operations,"

the BOP is now executing the following mandates:

---

[2] Available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.
[3] See the publicly available March 26, 2020 Memorandum from the Attorney General to the BOP Director, available at https://www.justice.gov/file/1262731/download.

• To immediately review all inmates who have COVID-19 risk factors, as established by the CDC, beginning with those at the institutions listed above; and

• To immediately process for transfer and to immediately transfer, following an appropriate quarantine, such inmates to home confinement.[4] Such transfer should be made even if electronic monitoring is not available, so long as "doing so is appropriate and consistent with [the Justice Department's] obligation to protect public safety."

Memorandum of the Attorney General to the Director of the Bureau of Prisons, "Increasing the Use of Home Confinement at Institutions Most Affected by COVID-19," April 3, 2020.[5] Accordingly, it is highly likely many more inmates will be released to home confinement following the BOP's administrative review process, thus obviating the need for compassionate release.

On April 5, 2020, the BOP responded promptly to that Memorandum, asserting it had begun "urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General," and that it had "increased resources to review and make appropriate determinations as soon as possible."[6] And those assertions are not hollow promises. In that same April 5, 2020 statement, BOP noted that since the time the Attorney General issued his March 26, 2020 Memorandum, "the BOP has placed an additional 566 inmates on home confinement," bringing the total number of inmates on home confinement to 3,419, and the total number in halfway houses to 7,199. *Id*. And according to BOP's website, as of May 3, 2020, an additional 1,972 inmates have been released to home confinement. *Id*.

While some inmates, in spite of the BOP's best efforts to establish and implement anti-COVID-19 protocols, have become ill or succumbed to the virus, the solution is not to exclude the

---

[4] The Memorandum specifies that this quarantine may occur at "an appropriate BOP facility," or "subject to your case-by-case discretion, in the residence to which the inmate is being transferred." April 3, 2020 Memorandum, at 2.

[5] Available at https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000.

[6] *See* https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.

BOP from reviewing applications for compassionate release. There are many challenging factors

to consider during this unprecedented pandemic, and the BOP is uniquely situated and qualified to

assess those factors during the statutorily required 30-day review period.[7] And, as discussed in

detail above, the administrative review is far from a pointless bureaucratic exercise, as an even

larger number of inmates' requests will likely be granted by the BOP in the light of the Attorney

General's April 3, 2020 directive.

Accordingly, consistent with the First Step Act, Gentry must first present his request to the

BOP, permitting it to evaluate his current circumstances in light of the coronavirus concerns. He

cannot petition for judicial relief until, as the statute explicitly provides, the BOP denies the request

or 30 days have passed after presentation of the request to the warden, whichever is earlier. As of

May 4, 2020, Gentry has not sought relief through BOP administrative channels and admits as

much in his motion. [Doc. No. 522, at 1–2]. Thus, because Gentry has not yet exhausted

administrative remedies, this Court must dismiss his motion for lack of jurisdiction. *See, e.g., Raia,*

954 F.3d at 597; *United States v. Koons*, No. 16-cr-214, 2020 WL 1940570 (W.D. La. Apr. 21,

2020) ("The Court's finding that, absent exhaustion, it lacks jurisdiction to proceed with this

motion is in accord with other Louisiana federal district courts, as well as myriad district courts

around the nation who have concluded that the First Step Act exhaustion requirements are

---

[7] For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to
incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and
health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most
efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant
has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors,
including the availability of transportation for inmates (at a time when interstate transportation services often used
by released inmates are providing reduced, if any, service), and of supervision of inmates once released (at a time
when the Probation Office has necessarily cut back on home visits and supervision).

Though it broadened the category of inmates entitled to be released to home confinement, the Attorney
General's April 3, 2020 Memorandum reaffirmed the importance of "the careful, individualized determinations BOP
makes in the typical case," noting that while "we must do everything we can to protect the inmates in our care, . . .
we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law
enforcement officers who protect us all." April 3, 2020 Memorandum, at 3.

mandatory and cannot be waived by the courts.") (collecting cases); *United States v. Cain,* No. 17-CR-00204, p. 4 (W.D. La. Apr. 8, 2020) ("The COVID-19 situation as it exists in the prison system does not, without more, establish that it is appropriate for the Court to accede to [the defendant's] request to jump over the procedure provided in the law on compassionate release. There is nothing extraordinary or compelling that convinces the court to ignore the requirement that [the defendant] first make his request to the Warden of the facility.").

Thus, Gentry's motion for compassionate release must be dismissed for lack of jurisdiction, as he  has not yet exhausted his administrative remedies

*Release to home confinement under the CARES Act*

Alternatively, to the extent Gentry's motion can be construed as a request for release to home confinement rather than compassionate release, his motion must similarly be dismissed, because decisions regarding where prisoners will serve their sentences are reserved exclusively to the BOP.

The BOP's Director retains the discretion to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." 18 U.S.C. § 3624(c)(2). Under the CARES Act, cited above, "if the Attorney General finds that emergency conditions will materially affect" BOP functioning, the BOP Director may "lengthen the maximum amount of time for which [he] is authorized to place a prisoner in home confinement" under Section 3624(c)(2). Pub. L. 116-136, § 12003(b)(2). As noted above, on April 3, 2020, the Attorney General made such a finding, stating that because of COVID-19, "emergency conditions are materially affecting the functioning" of the BOP, so that the BOP director now has authority

to grant home confinement to a larger group of prisoners. *See* Attorney General's April 3, 2020 Memorandum to Director, Bureau of Prisons.[8]

Decisions regarding prisoner designations, including release to home confinement, are reserved exclusively to the BOP, as they involve specialized determinations uniquely within its expertise. See 18 U.S.C. § 3621(b) (providing that "[t]he Bureau of Prisons shall designate the place of the prisoner's imprisonment," taking into account his security designation, his programmatic needs, his mental and medical health needs, his faith-based needs, the proximity to his primary residence, BOP's security concerns, and the recommendations of the sentencing court). Courts have no authority to dictate prisoner placements, and BOP's prisoner designations are not subject to judicial review. *Id.* ("The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another . . . . A designation of a place of imprisonment under this subsection is not reviewable by any court"). *See, e.g., Siebert v. Chandler*, 586 F. App'x 188, 189 (5th Cir. 2014) ("Moreover, a prisoner has no liberty interest or right to be housed in any particular facility, and the BOP has wide discretion in designating the place of a prisoner's imprisonment."), *citing Olim v. Wakinekona,* 461 U.S. 238, 244–45 (1983) and 18 U.S.C. § 3621(b).

In light of these statutory provisions, various courts have recognized a district court has no jurisdiction to order home confinement under the CARES Act, as that decision is reserved to BOP. *See United States v. Read-Forbes*, Crim. No. 12-20099, 2020 WL 1888856, at *5 (D. Kan. Apr. 16, 2020) ("While the CARES Act gives the BOP broad discretion to expand the use of home confinement during the COVID-19 pandemic, the Court lacks jurisdiction to order home detention under this provision."); *United States v. Engleson*, No. 13-cr-340, 2020 WL 1821797, at *1

---

[8] Available at: https://www.justice.gov/file/1266661/download.

(S.D.N.Y. Apr. 10, 2020) (same, though noting the district court can make a non-binding recommendation); *United States v. Hembry*, No. 12-cr-119, 2020 WL 1821930, *2 (N.D. Cal. Apr. 10, 2020); *United States v. Carter,* No. 1:18-cr-00086, 2020 WL 1808288, at *2 (S.D. Ind. Apr. 9, 2020); *United States v. Garza*, No. 18-cr-1745, 2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020).

Accordingly, the Court has no jurisdiction to order that Gentry be released to home confinement.

*Conclusion*

Whether construed as a motion for compassionate release or a motion seeking release to home confinement, this Court is currently without jurisdiction to grant Gentry the relief he seeks. Therefore, for the foregoing reasons,

**IT IS ORDERED** that Gentry's motion [Doc. No. 522] is **DENIED** at this time, subject to re-urging if Gentry exhausts his administrative remedies as set forth in the statute.

MONROE, LOUISIANA, this 5th day of May, 2020.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE